# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-0176 |
| | : | |
| v. | : | |
| | : | |
| AQUDRE QUAILES | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

Before the court is a motion to suppress evidence filed by Defendant Aqudre Quailes ("Quailes"). (Doc. 29.) Quailes seeks to suppress evidence seized from his girlfriend's residence. After reviewing the briefs and considering the evidence presented during a hearing, the court finds Quailes has standing to challenge the search and that Kristin Mahone gave voluntary consent to search her residence. Accordingly, for the reasons that follow, the court will deny the motion to suppress evidence.

### PROCEDURAL HISTORY[1]

On June 23, 2021, the United States filed an indictment against Quailes alleging one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and 924(e). (Doc. 1.) The pending motion to suppress was filed on June 1, 2022, along with a brief in support thereof. (Docs. 29, 30.) An evidentiary hearing was held on October 7, 2022. Thereafter, the Government

---

[1] The facts detailed in this opinion are based on the record established during the October 7, 2022 evidentiary hearing and the briefing on the motion to suppress.

1

filed its brief in opposition on November 10, 2022, and Quailes filed a reply brief on November 29, 2022.  (Docs. 68, 73.)

## FACTUAL FINDINGS

Quailes absconded from parole with the Commonwealth of Pennsylvania, and consequently an arrest warrant was issued on December 6, 2020.  In January 2021, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began monitoring Quailes' social media postings which depicted him possessing and brandishing a firearm.  Based on these social media postings, ATF obtained a warrant to "ping" the location of Quailes' cell phone.

The United States Marshals' Fugitive Task Force ("Task Force") had evidence that Quailes was staying at 71 MW Smith Homes in Harrisburg, Pennsylvania, which was rented by his significant other, Kristian Mahone ("Mahone").  On March 9, 2021, ATF Special Agent Brenda McDermott ("SA McDermott") observed Quailes driving a black Kia SUV registered to Mahone in the Walmart parking lot on Grayson Road in Harrisburg, Pennsylvania.  SA McDermott contacted the Task Force for assistance to arrest Quailes.  Quailes was followed from Walmart to the MW Smith Homes community, where he parked at the rear of Mahone's residence and was taken into custody by Sergeant Tyron Meik ("Sgt. Meik") and another officer from the Harrisburg Police Department.

As Sgt. Meik arrested Quailes, Detective Mike Rudy ("Detective Rudy") from the Harrisburg Police Department arrived on scene.[2]

During Quailes' arrest, officers noticed a strong odor of marijuana coming from the Kia. Following a search of the Kia, no marijuana or other contraband was located. During a later conversation with Mahone, officers learned that the Kia may have smelled like marijuana because Quailes smoked before leaving her residence.[3]

Sgt. Meik and Detective Rudy decided to contact Mahone at her residence to advise her about the Kia, provide her with the keys to the Kia, and talk to her about Quailes. After knocking on the door, Mahone opened the main inside door to 71 MW Smith Homes and the officers smelled a strong odor of marijuana coming from the house. Based on the smell of marijuana and Quailes' social media posts depicting firearms with a distinctive striped wall in the background which was visible in Mahone's living room, Detective Rudy asked Mahone whether there was anything illegal inside her home. She responded that there was not. However, SA McDermott previously informed the Task Force, which included Detective Rudy,

---

[2] During Quailes' arrest and the search of 71 MW Smith Homes, multiple other officers were on scene, including: Officer Bender, two K-9s, Agent Walton, Officer Adrienne Salazar, and Officer Jacobbi Harper.

[3] Mahone told officers that her apartment smelled like marijuana because several individuals had been smoking marijuana in her apartment earlier that morning.

that based on social media posts, there was reason to believe firearms were inside the residence.

Detective Rudy requested consent to search Mahone's home. During the discussion, Detective Rudy informed Mahone repeatedly that she did not have to consent and if she did not, law enforcement would request a search warrant for the residence. Mahone verbally consented to the search of her residence and then signed a consent to search form. Detective Rudy estimated that from the time he knocked on Mahone's door until she gave verbal consent was approximately a few minutes.

During the evidentiary hearing, there was conflicting testimony regarding which officer explained the consent to search form to Mahone and obtained her signature. Detective Rudy recalled reading the form to Mahone and observing her signature, but Officer Adrienne Salazar[4] from the Harrisburg Police Department testified that she handled the form with Mahone. Mahone recalls Sgt. Meik obtaining her signature on the consent form. Conversely, Sgt. Meik testified that he was simply present at the time the form was signed and Detective Rudy executed the consent form with Mahone. Regardless of which officer obtained Mahone's signature, Mahone testified that she signed the consent form but disputes

---

[4] At the evidentiary hearing, Officer Salazar identified herself as Officer Monroy and testified that her name changed between Quailes' arrest and the hearing. Because the paperwork relating to Quailes' arrest identifies her as Officer Salazar, the court will refer to her by that name herein.

the circumstances surrounding that consent. The consent form was then submitted as evidence, but subsequently lost.

Mahone testified that she only provided consent to search her home because officers threatened to take her children away from her. While she testified that she initially refused consent to search her apartment when she was on the porch talking to officers, Detective Rudy testified that Mahone never refused or withdrew her consent. Detective Rudy, Sgt. Meik, and Officer Salazar testified that Mahone was cooperative throughout their interactions and the search.

Relating her experience during the hearing, Mahone stated that she was working from home at the time of Quailes' arrest and was speaking with a customer with her manager monitoring the call around 11:55 a.m. Mahone testified that she heard someone yell "get down on the ground, don't move" outside her residence. Although her manager was monitoring the call, Mahone abandoned her work call to look out her back door. When she did, Mahone saw what she estimated to be about fifty law enforcement officers around her back porch and observed Quailes in handcuffs. Around this time, a neighbor purportedly sent Mahone a video to show the events occurring outside of her residence.

Mahone testified that four officers initially came to her front door with her keys and opened her screen door. She recalls that there were two United States

Marshals, one probation or parole officer, and one Harrisburg Police Officer. After watching this through her front door peephole, Mahone stated that she came outside and shut both doors behind her to speak with the officers. Sgt. Meik reportedly advised Mahone that Quailes was in a lot of trouble and requested permission to search her residence. Mahone testified that she initially refused consent to search her residence when Sgt. Meik and Detective Rudy made the request. However, after they questioned her about the smell of marijuana, and advised her that they could "just go to the office" to get permission to conduct a search of her residence, she agreed to provide consent. Mahone further testified that she pleaded with Sgt. Meik and Detective Rudy to obtain a warrant.

Regarding the consent form, Mahone testified that the consent form was not executed until officers were already searching her residence. She believed that if she signed the consent form, the officers would not take her children from her and would not be arrested for any contraband found in her home. Ultimately, Mahone testified that she only changed her mind regarding consent because officers had their rifles pointed at her as if they were hunting. She reported that while she was sitting on the couch during the search of her residence, officers continued to have their firearms out.

Mahone relayed several concerns regarding the events that took place on March 9, 2021. She testified that she was concerned about people "knowing [her]

business" and had to "fight" her neighbor due to this incidence. The neighbor was purportedly telling others that Mahone was working with the police. Mahone also testified that she was upset, fearful, and uncomfortable the entire time officers were in her house.

## DISCUSSION

Quailes sets forth two arguments in support of his motion to suppress evidence.[5] First, as a threshold issue, Quailes asserts that he has standing to challenge the search of 71 MW Smith Homes. (Doc. 30, pp. 4–5.)[6] The Government concedes this issue, *see* Doc. 73, p. 6, thus, the court finds that Quailes has standing to challenge the search. Second, Quailes argues that the warrantless search of 71 MW Smith Homes was unlawful because Mahone consented to the search only through coercion by law enforcement. (Doc. 30, pp. 5–7; Doc. 73, pp. 11–15.)

---

[5] Quailes also raises an argument regarding the "knock and talk" doctrine for the first time in his reply brief. (Doc. 73, pp. 6–11.) The court finds that it does not need to address this argument because this doctrine and case law applying it are simply not applicable to the situation before this court. The "knock and talk" doctrine is applied in cases where officers respond to a report of criminal activity, minor complaint, or tip. *See, e.g.*, *Florida v. Jardines*, 133 S. Ct. 1409 (2013) (using a drug-sniffing dog on defendant's front porch after receipt of an unverified tip of drug activity); *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) (applying the doctrine where officers were responding to a minor complaint); *United States v. Butler*, 405 F. App'x 652 (3d Cir. 2010) (responding to a report of drug trafficking activity in an apartment building). That is not the circumstances before this court, thus, the court finds the "knock and talk" doctrine inapplicable.

[6] For ease of reference, the court uses the page numbers on the CM/ECF header.

The Fourth Amendment provides individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable," unless the home occupants consent to a search or probable cause and exigent circumstances exist to justify the warrantless intrusion. *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotations omitted); *United States v. Coles*, 437 F.3d 361, 365–66 (3d Cir. 2006) (citations omitted). Consensual searches have long been approved "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). The burden of justifying a consent search is on the Government to prove that "the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

There is "no talismanic definition of 'voluntariness' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). Rather, voluntariness is determined by reviewing the totality of the circumstances. *Id.* at 227. "Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment."

*United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (citing *Schneckloth*, 412 U.S. at 226). The Third Circuit also identified "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions" as relevant to the voluntariness inquiry. *Id.* (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)).

Expanding on the voluntariness of consent in his reply brief, Quailes argues that the accuracy of Detective Rudy and Sgt. Meik's testimony is questionable since neither can recall whether Mahone provided verbal consent inside or outside her residence. (Doc. 73, p. 11.) Additionally, Quailes submits that the "Harrisburg Police Department's policy of not permitting detectives to wear cameras should also give [the court] great pause." (*Id.* at 12.) Finally, Quailes relies on the testimony of Mahone, which he argues was credible and consistent. (*Id.* at 12–13.) Qualies maintains that Mahone was uncomfortable and felt threatened, thus, forcing her to consent to the search of her home. (*Id.*)

The Government argues that Mahone's verbal and written consent was voluntary. (Doc. 68, pp. 7–12.) In evaluating the credibility of witnesses at the hearing, the Government submits that law enforcement testimony was consistent that Mahone was cooperative throughout the incident and never requested officers to cease the search. (*Id.* at 9.) Conversely, Mahone testified that she was upset and uncomfortable because the officers were confrontational, had their firearms

9

unholstered in her residence, and threatened to take her children away if she did not consent to the search.  (*Id.*)  The Government argues that the consistency of the law enforcement testimony weighs against accepting Mahone's version of events and in favor of a finding of voluntariness.  (*Id.* at 9–10.)  Further, the Government submits that these observations are consistent with Mahone's demeanor in the body-worn camera footage that captures events immediately following the consent.  (*Id.* at 10.)

Additionally, the Government points out that Detective Rudy informed Mahone of her right to refuse consent and, if she did so, he would apply for a search warrant.  (*Id.* at 12.)  The Government submits this was appropriate because the officers had probable cause to obtain a warrant.  Thus, this was a factual statement rather than a baseless threat that would make Mahone's consent involuntary.  (*Id.* at 12–13.)  Mahone acknowledged and the officers observed that there was an odor of marijuana coming from Mahone's residence.  (*Id.* at 13–14.)  Additionally, the Task Force knew Quailes had been at Mahone's residence earlier that day and had probable cause to believe that Quailes was staying there regularly based on social media posts depicting him holding firearms inside the residence.  (*Id.* at 14.)

The parties do not dispute that Mahone provided verbal and written consent to search her residence.  Thus, the question before the court is solely whether that

consent was voluntary. Reviewing the factors that courts consider in determining voluntariness, the court finds as follows. Mahone is a thirty-year old woman with two children. She graduated from high school and completed several semesters of college before discontinuing college courses for family reasons. Detective Rudy advised Mahone of her right to refuse consent several times and, contrary to Mahone's testimony, she never refused consent to search her residence. Further, the discussion about consenting to a search between Mahone and law enforcement officers only lasted a few minutes. While there is nothing in the record showing the length of the search, neither party has represented that the encounter or questioning was unreasonable, prolonged, or repetitive. Finally, there was no claim of physical force or punishment being exerted on Mahone in obtaining consent to search Mahone's residence.

The court also considers "the setting in which the consent was obtained [and] the parties; verbal and non-verbal actions." *Price*, 558 F.3d at 278. In considering the setting, the court must evaluate the credibility of the witnesses at the evidentiary hearing. Here, although Quailes asserts that the court should find Mahone credible, the court finds that Mahone's testimony lacks credibility and is contradicted by much of the other evidence before the court. The police incident report and the testimony of Detective Rudy, Sgt. Meik, and Officer Salazar, which the court finds credible, indicate that Mahone never withheld consent to search her

home. Rather, she was cooperative throughout their interactions on March 9, 2021. This is further emphasized by Mahone's demeanor in the body-worn camera footage provided as evidence. Although the footage captures Mahone during the search of her residence rather than when she provided consent, it shows her being cooperative and calm. Reviewing this footage, you can hear Mahone tell Detective Rudy, "I let you come in here, ain't nothing to do with me." Thus, Mahone's verbal and non-verbal actions belie her assertion that her consent to search was involuntary.

Quailes' remaining arguments are unavailing. The court does not find it troubling the Detective Rudy and Sgt. Meik cannot recall whether Mahone provided verbal consent inside or outside her residence. This incident took place over two years ago and that detail does not appear to be memorialized in their written reports. Additionally, the police department's policy of "not permitting detectives to wear cameras" does not detract from the officers' credibility in this instance.

Accordingly, reviewing the totality of the circumstances, the court finds that Mahone provided voluntary consent to search her residence.[7]

---

[7] The Government also argues that there were exigent circumstances that permitted the warrantless search of Mahone's residence regardless of consent. (Doc. 68, pp. 14–18.) Because the court finds that Mahone provided voluntary consent, the court need not make a determination regarding exigency.

## CONCLUSION

For the reasons stated herein, the court will deny the motion to suppress evidence. (Doc. 29.) An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: May 26, 2023