# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-0176 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AQUDRE QUAILES | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

Defendant Aqudre Quailes ("Quailes") is charged in a one-count indictment with possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1.)  Quailes moved to dismiss the single-count indictment based on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022), arguing that Section 922(g)(1) was unconstitutional as applied to him.  (Doc. 58.)  The court denied the motion based on the precedential panel opinion in *Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022) (*per curiam*), which reaffirmed the constitutionality of Section 922(g)(1) under the history and tradition framework established in *Bruen* as applied to the appellant. (Doc. 74.)  Quailes now moves for reconsideration of the denial based on the *en banc* decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), which found Section 922(g)(1) unconstitutional under the *Bruen* framework as applied to Bryan Range, the appellant.  (Doc. 85.)

1

For the reasons that follow, the court will grant the motion for reconsideration, and grant the motion to dismiss the indictment because the Government has failed to meet its burden under the standard announced in *Bruen* and applied in *Range*.  As applied to Quailes, the Government has not established that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation."

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Quailes was charged by indictment on June 23, 2021, with one count of possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1.)  He is accused of possessing two loaded firearms as well as additional ammunition on or about March 9, 2021, while knowing that he was previously convicted of a crime punishable by a prison term of more than one year.  (*Id.*)  The prior conviction is not specified in the indictment.  (*Id.*)  However, the Government has indicated that Quailes has four prior Pennsylvania convictions for felony drug offenses involving the possession with intent to distribute heroin and cocaine, which makes it unlawful for him to possess a firearm or ammunition pursuant to 18 U.S.C. § 922(g)(1).  (Doc. 92, pp. 4–5; Doc. 92-1.)[1]

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

Quailes had an initial appearance on July 8, 2021, and was detained pending trial.  (Doc. 14.)  On June 1, 2022, Quailes filed a motion to suppress evidence, which was denied following a hearing.  (Docs. 29, 81, 82.)

Quailes also filed a motion to dismiss the indictment based on the Supreme Court's decision in *Bruen*, arguing that Section 922(g)(1) is unconstitutional as applied to him.  (Doc. 58.)  After the parties briefed the issue, the court entered an order on November 10, 2022, deferring ruling on the pending motion to dismiss in order to incorporate by reference the expected expert historical reports that would be filed in another criminal case pending in this district.  (Doc. 69.)  On November 22, 2022, the court vacated the November 10 order in light of the Third Circuit Court of Appeals panel decision in *Range*.  (Doc. 70.)  The court then denied Quailes' motion to dismiss on December 1, 2022, based on the precedential panel opinion in *Range*, which reaffirmed the constitutionality of Section 922(g)(1) under the history and tradition framework established in *Bruen*, as applied to an appellant whose prohibited status resulted from a conviction for welfare fraud, a non-violent misdemeanor under Pennsylvania law.  (Doc. 74.)

Then, on June 29, 2023, Quailes filed a motion for reconsideration of the order denying his motion to dismiss the indictment.  (Doc. 85.)  Quailes asserts that reconsideration is warranted because, following the court's denial of his motion, the Third Circuit vacated the panel opinion in *Range*, and then issued an *en banc*

opinion finding that Section 922(g)(1) violates the Second Amendment as applied
to Range based on the application of the holding in *Bruen*. (Doc. 85.) The parties
have briefed both the request for reconsideration and the merits of the underlying
motion to dismiss. (Docs. 86, 92, 94.) Thus, this motion is ripe for disposition.

Quailes remains detained pending trial on the sole charge of felon in
possession of a firearm and ammunition pursuant to Section 922(g)(1). He is
scheduled for a date-certain jury trial on September 25, 2023. (Doc. 89.) Quailes
also has pending a motion to dismiss the enhanced penalty under the Armed Career
Criminal Act and a motion *in limine* to exclude certain evidence. (Docs. 90, 99.)

DISCUSSION

### A. Quailes' Motion for Reconsideration Will Be Granted Based on An Intervening Change in the Controlling Law.

As recounted above, Quailes originally moved to dismiss the felon in
possession count under Section 922(g)(1) based on the holding of *Bruen*. The
court denied the motion based on the panel opinion in *Range*, which was binding
precedent directly on point that controlled the outcome of Quailes' motion to
dismiss. Quailes now moves to reconsider that denial because the Third Circuit's
*en banc* decision in *Range*, which vacated the panel opinion, is an intervening
change in the controlling law. (Doc. 86, p. 2 & n.1.) In response, the Government
maintains that the *en banc* opinion in *Range* is wrongly decided, and also
distinguishable because Quailes is not like Range. (Doc. 92, pp. 6–7.) However,

4

the Government's brief in opposition proceeds to address the merits of Quailes'
motion to dismiss without responding to Quailes' assertion that he meets the
standard for reconsideration, ultimately asserting that Quailes' motion to dismiss
the indictment should be denied.  (*Id.* at 7–26.)

A party seeking reconsideration of a district court's order must show either
(1) "an intervening change in the controlling law"; (2) the availability of new
evidence that was not available when the court issued its prior order; or (3) "the
need to correct a clear error of law or fact or to prevent manifest injustice."  *Max's
Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)
(citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d
Cir. 1995)).  In light of the fact the court denied Quailes' *Bruen*-based motion to
dismiss based on the panel opinion in *Range*, which the court found to be
controlling, and then that controlling panel opinion was vacated and replaced by
the *en banc* opinion reaching the opposite conclusion, Quailes easily satisfies the
standard for reconsideration based on an intervening change in the controlling law.
The Government has not presented any argument to the contrary.  Accordingly, the
court will now address the merits of Quailes' motion to dismiss based on the
application of the holding in *Bruen* as informed by the *en banc* decision in *Range*.

**B. Quailes' Motion to Dismiss Will Be Granted.**

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).  In his pretrial motion to dismiss, Quailes asserts an as-applied challenge to Section 922(g)(1).  In order to resolve an as-applied challenge, the court determines whether a law with some permissible uses "is nonetheless unconstitutional as applied" to the movant's conduct.  *Spence v. Washington*, 418 U.S. 405, 414 (1974).  In his reply brief, Quailes also raises a facial challenge to Section 922(g)(1) for the first time.  (Doc. 86, pp. 6–8.)  The standard that applies to a facial challenge is whether a law "could never be applied in a valid manner."  *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984).  This standard sets an extremely high bar because the challenger must establish that "no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  However, the court will not address the facial challenge because it was raised for the first time in the reply brief and the Government has not had an opportunity to respond.

Quailes argues that the court should dismiss the Section 922(g)(1) charge of felon in possession of a firearm and ammunition based on the *en banc* ruling in *Range*, because it applied the holding of *Bruen* to find Section 922(g)(1)

unconstitutional as applied to Range. (Doc. 86, pp. 2–3.) Specifically, Quailes proceeds to argue, pursuant to *Bruen* and *Range*, that he has Second Amendment rights despite being a convicted felon; Section 922(g)(1) regulates Second Amendment conduct; and that the Government cannot show that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation." (*Id.* at 4–8.)

The Government first asserts that *Range* is wrongly decided and preserves all arguments in support of that position. (Doc. 92, pp. 6–7 n.1.) However, the Government then proceeds to argue that *Range* is a narrow decision that is limited to the facts surrounding Range's prior conviction, which are readily distinguishable from Quailes' prior convictions. (*Id.* at 7–9.) The Government asserts that the prohibition of firearm possession by a convicted offender such as Quailes passes constitutional muster for three separate, independent reasons: "(1) he does not maintain that he possessed the guns for a lawful purpose; (2) he was permissibly barred from possession of a firearm while on state parole; and (3) even assuming Range was correctly decided, the bar on firearm possession for a felon such as Quailes is constitutionally permissible based on the historical test outlined in *Bruen*." (*Id.* at 12.)

In reply, Quailes notes that *Range* is binding precedent for this court, and the Government's disagreement with the holding of *Range* and contrary non-binding

authorities are inconsequential.  (Doc. 94, p. 3.)  Quailes asserts that the Government's argument that Quailes must establish that he possessed the firearms for a lawful purpose "reads a requirement into the *Bruen/Range* analysis that does not exist."  (*Id.* at 2.)  Quailes also contends that his status as a state parolee is irrelevant under the *Bruen/Range* analysis.  (*Id.*)  Finally, Quailes argues that the Government has not met its burden of establishing that Section 922(g)(1) comports with the Nation's "historical tradition of firearm regulation," given that "the *Range* court rejected the very arguments the Government rehashes here."  (*Id.* at 3–6.)

The criminal statute at issue in this case is 18 U.S.C. § 922.  The portion of the statute at issue in this case is Section 922(g)(1), which states: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . ."  There is no dispute that Quailes has prior felony convictions that criminalize his possession of a firearm under the statute.  But the question presented is whether it is *constitutional* for the statute to criminalize his firearm possession for life based on his prior felony drug trafficking convictions.

The court will begin its analysis with the text of the Second Amendment and a brief explanation of the recent, significant developments in Second Amendment precedent from the Supreme Court and the Third Circuit Court of Appeals.  The

court will then apply the precedential decisions in *Bruen* and *Range* to the facts

and arguments in this case.[2]

### 1. The Text of the Second Amendment and Significant Rulings on the Second Amendment

The text of the Second Amendment states: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  U.S. CONST. amend. II.

From 1939 to 2008, the Second Amendment was interpreted in accordance

with *United States v. Miller*, 307 U.S. 174 (1939).  In *Miller*, the Supreme Court

focused on the history and meaning of the word "Militia" in the context of the

Second Amendment.  The Court observed that the Constitution, as originally

adopted, granted Congress the power "'To provide for calling forth the Militia to

execute the Laws of the Union.'"  *Miller*, 307 U.S. at 178 (quoting U.S. CONST.

art. 1, § 8).  The Court then held: "With obvious purpose to assure the continuation

and render possible the effectiveness of such forces the declaration and guarantee

of the Second Amendment were made. It must be interpreted and applied with that

end in view."  *Id.*  This Militia-based rationale for the Second Amendment held

sway for 70 years.  *See United States v. Bullock*, No. 3:18-CR-165, 2023 WL

---

[2] The court notes that it will resolve the motion to dismiss based on the parties' presentations in their briefs.  Neither party has presented an expert report from a historian or requested that the court appoint an expert historian.  Pursuant to the Supreme Court's instruction, the court is "entitled to decide a case based on the historical record compiled by the parties."  *Bruen*, 142 S. Ct. at 1230 n.6.

4232309, at *6 (S.D. Miss. June 28, 2023) (discussing scholarly articles regarding *Miller*).

Then, in 2008 and 2010, the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), resulting in a significant change in our understanding of the Second Amendment. In those decisions, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 142 S. Ct. at 2122 (citing *Heller*, 554 U.S. at 570; *McDonald*, 561 U.S. at 742). And then, in 2022, the Court held in *Bruen* "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* Following the holdings of *Heller*, *McDonald*, and *Bruen*, the Nation now understands that the Second Amendment establishes an individual right to keep and bear arms that does not depend on service in the militia.

In the years following *Heller* and *McDonald*, "the Courts of Appeals . . . coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125. In *Bruen*, the Court rejected the two-step framework that had developed, and detailed the correct standard to be applied to Second Amendment challenges. *Id.* at 2126–34. The Court explained that the correct standard is as follows:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).

The Court provided some guidance as to how courts are to assess whether a modern firearm regulation is consistent with historical tradition. The Court observed first that when analyzing a modern firearm regulation that addresses a "general societal problem that has persisted since the 18th century":

> [T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131. On the other hand, when analyzing a modern firearm regulation that was "unimaginable" during the founding era, the Court instructs:

> [T]his historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id.* at 2132 (citation omitted).  In order to ascertain whether regulations are "relevantly similar," the Court notes that "*Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.  The Court explains that the burden on the Government is to identify a "well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

### 2.  The Third Circuit Applies *Bruen* in *Range*

Nearly one year after *Bruen* was decided, the Third Circuit issued an *en banc* decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023).  The majority opinion, authored by Judge Hardiman and joined by eight judges, holds that Bryan Range remains among "the people" protected by the Second Amendment despite his false statement conviction, and "because the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range," Section 922(g)(1) violates the Second Amendment as applied to Range.[3]  *Id.* at 98.

---

[3] Only one other Circuit Court of Appeals has applied the *Bruen* standard to Section 922(g)(1). On June 2, 2023, the Eighth Circuit Court of Appeals held that Section 922(g)(1) was constitutional as applied to the defendant based on his particular felony convictions.  *United States v. Jackson*, 69 F.4th 495, 501 (8th Cir. 2023).  In *United States v. Jackson*, the Court relied upon the "assurances" in *Heller*, *McDonald*, and *Bruen* stating that the holdings in those cases do not cast doubt on "longstanding prohibitions on the possession of firearms by felons" and the

The *Range* decision arises from a civil suit rather than a criminal prosecution.  In 1995, Bryan Range pleaded guilty in the Court of Common Pleas of Lancaster County to one count of making a false statement to obtain food stamps in violation of Pennsylvania law.  He was sentenced to three years' probation, and ordered to pay restitution, costs, and a fine.  When Range pleaded guilty, his conviction was classified as a misdemeanor punishable by up to five years' imprisonment.  That felony-equivalent conviction precludes Range from possessing a firearm pursuant to 18 U.S.C. § 922(g)(1).  After Range learned that he was barred from possessing a firearm because of his 1995 conviction, he filed a civil action seeking a declaration that Section 922(g)(1) violates the Second Amendment as applied to him and an injunction prohibiting the law's enforcement against him.  *Range*, 69 F.4th at 98–99.

The parties filed cross motions for summary judgment.  The district court granted the Government's motion, applying then-controlling Third Circuit

---

history that supports those assurances, to conclude that "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."  69 F.4th at 501–06.

The Fifth Circuit Court of Appeals has determined that Section 922(g)(8), which criminalizes the possession of firearms for a person subject to a domestic violence restraining order, fails the history and tradition test in *Bruen* and thus violates the Second Amendment.  *United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023) (granting a facial challenge to the section of the statue).  The Supreme Court granted certiorari in this case on June 30, 2023.  *United States v. Rahimi*, 143 S. Ct. 2688 (2023).  In addition, the Fifth Circuit Court of Appeals granted a defendant's as-applied challenge to Section 922(g)(3), which criminalizes the possession of a firearm for unlawful users of a controlled substance, because that section, too, failed the history and tradition standard in *Bruen*.  *United States v. Daniels*, __ F.4th __, No. 22-60596, 2023 WL 5091317 (5th Cir. Aug. 9, 2023).

precedent. *Id.* at 99 (noting that the district court relied upon *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016), *Holloway v. Att'y Gen.*, 948 F.3d 164 (3d Cir. 2020), and *Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020)).  Range appealed, and while his appeal was pending, the Supreme Court decided *Bruen*.  The panel hearing Range's appeal affirmed the district court's grant of summary judgment in the Government's favor, holding that the Government had met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction "places him outside the class of people traditionally entitled to Second Amendment rights." *Range*, 53 F.4th at 266.  Range then petitioned for rehearing *en banc*, the court granted the petition, and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2022).

The *en banc* majority opinion concludes by clarifying that the decision is "a narrow one" deciding the constitutionality of Section 922(g)(1) only as applied to Bryan Range based on his prior felony-equivalent false statement conviction.[4]

---

[4] Judge Ambro authored a concurring opinion to separately make the point that the success of Range's as-applied challenge "does not spell doom for § 922(g)(1)." *Range*, 69 F.4th at 109. Judge Ambro observes that Section 922(g)(1) "remains 'presumptively lawful'" because "it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society." *Id.* at 110. Judge Ambro's review of historical analogues leads him to conclude that there is, in general, a historical tradition of stripping firearms from those who cannot be trusted with them because they pose a threat to the orderly functioning of society. *Id.* at 111–12. Ultimately, he concurs with the majority opinion because presumptions can be rebutted, and the Government did not carry its burden of

*Range*, 69 F.4th at 106.  Because *Range* is binding precedent applying *Bruen* in the context of an as-applied challenge to Section 922(g)(1)—the same criminal statute at issue in this case—it is important to understand the court's analysis and rationale.

Applying *Bruen*, the court explained that the first part of the analysis is to decide whether the text of the Second Amendment applies to the person and his proposed conduct.  As noted by the court, this determination is significant, because if the Second Amendment applies to the person and proposed conduct, then the Government bears the burden of proving that the firearms regulation at issue "'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  *Range*, 69 F.4th at 101 (quoting *Bruen*, 142 S. Ct. at 2127).

On the first question, the court determined that Range remains one of "the people" despite his prior conviction.  *Id*. at 101–03.  The court reached this conclusion for four reasons, none of which depended on the specifics of Range's conviction.  First, the court noted that because the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue, the Supreme Court's references to "law-abiding, responsible citizens" were dicta that should not be construed too broadly.  *Id*. at 101.  Second, the court observed that other

---

proving that Range poses a threat to the orderly functioning of society.  Accordingly, in his view, Range may not be constitutionally disarmed based on the record presented.  *Id.* at 112.

constitutional provisions, including the First and Fourth Amendments, also reference "the people," and the meaning of "the people" should not vary across provisions. *Id.* at 101–02.  Third, the court agreed with the statement in *Binderup* and the logic of then-Judge Barrett in her dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), that persons with Second Amendment rights may nonetheless be denied possession of a firearm.  Finally, the court noted that the phrase "law-abiding, responsible citizens" is too expansive and vague to constitute a workable standard and would, in any event, give far too much authority to legislatures to decide whom to exclude from "the people."  *Id.* at 102–03.

Next, the court addressed the "easy question" of whether the Second Amendment applies to the proposed conduct.  The court held that Section 922(g)(1) regulates Second Amendment conduct because Range's request to possess a rifle to hunt and a shotgun to defend himself at home are plainly within the constitutional right as defined by *Heller*.  As a result, "the Constitution presumptively protects that conduct."  *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2126).

Finally, the court addressed the question of whether "the Government ha[d] justified applying Section 922(g)(1) to Range 'by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'"  *Id.* (quoting *Bruen*, 142 S. Ct. at 2130.)  The court held that the Government did not

carry its burden.  *Id.*  The court addressed five discrete arguments presented by the Government, but found that none satisfied the Government's burden.  *Id.* at 103–06.  Ultimately, the court determined that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights."[5]  *Id.* at 106.

### 3.  Application of the *Bruen* and *Range* Analytical Framework to This Case

The analytical framework for addressing the as-applied constitutional challenge to Section 922(g)(1) is established in *Range*, which applies the standard set forth in *Bruen*.  *Range*, 69 F.4th at 101.  The court will apply this framework to the facts and arguments presented in this case.

As a preliminary matter, the Government asserts that *Range* is wrongly decided and distinguishable from the facts of this case.  (Doc. 92, pp. 6–7.)  The court will not address the argument that *Range* is wrongly decided because the Government has merely included that argument to preserve it for appellate review. (*See id.*)  The Government distinguishes *Range* based on the fact that Bryan Range

---

[5] In *United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023), the district court reached the same conclusion with respect to the defendant, who had a prior conviction for aggravated assault and manslaughter.  After a detailed and thorough analysis of Second Amendment precedent and the arguments presented by the parties, the court determined that the Section 922(g)(1) charge must be dismissed because the Government failed to carry its burden of establishing that a historical tradition supports a lifetime criminalization of the defendant's possession of a firearm.  *Id.* at *6–31.

had a "single decades-old conviction for making a false statement to obtain food stamps," whereas Quailes sustained multiple and recent convictions for four separate incidents of drug trafficking. (*Id.* at 8.) The court agrees with the Government that Quailes is "manifestly not like Range" based on a comparison of their prior convictions. The court further agrees that this is a meaningful distinction between the *Range* decision and the facts of this case that bears discussion, as detailed in the following sections. However, it is not sufficient to simply distinguish the facts of the cases because that does not answer the question of whether the criminalization of firearm possession by Quailes is constitutional. In order to make that determination, the court must conduct the analysis required by *Bruen* and *Range*.[6]

### i. Quailes, as a convicted felon, has Second Amendment rights.

The threshold question that must be addressed is whether Quailes is one of "the people" protected by the Second Amendment despite having prior felony

---

[6] In *United States v. Law*, No. 20-341, 2023 WL 5176297 (W.D. Pa. Aug. 11, 2023), the district court denied the defendant's motion for reconsideration of his motion to dismiss a Section 922(g) charge based on *Range*, because the defendant failed to raise a meaningful as-applied challenge to the statute and the predicate crime in *Range* was distinguishable from the defendant's predicate offense and other disqualifying circumstance of firearm possession while under a criminal justice sentence. In the *Law* case, the district court denied the motion for reconsideration and did not consider the merits of the motion to dismiss, whereas this court has granted Quailes' motion to reconsider and is addressing the merits of the constitutional challenge. Thus, it is not sufficient in this case to merely note that the disqualifying predicate offense in *Range* is distinguishable from the predicate offense in this case.

convictions.  *Range*, 69 F.4th at 101.  Quailes asserts that he remains among "the

people" for Second Amendment purposes, and the Government does not disagree.

(Doc. 86, pp. 4–5; Doc. 92, p. 11.)

The Third Circuit determined that Bryan Range was among "the people"—

despite his prior felony-equivalent conviction—for four reasons.  *Range*, 69 F.4th

at 101–03.  Those four reasons do not depend to any extent on the nature of

Range's prior conviction.  Accordingly, the fact that Quailes has felony drug

trafficking convictions instead of Range's false statement conviction is a

distinction, but it does not warrant a different conclusion as to the threshold

question of whether Quailes is one of "the people" protected by the Second

Amendment.  He is.

### ii.  Section 922(g)(1) regulates Second Amendment conduct.

After determining that Range was one of "the people," the court turned to

the "easy question" of whether Section 922(g)(1) regulates Second Amendment

conduct.  *Range*, 69 F.4th at 103.  The court held that Section 922(g)(1) does

regulate Second Amendment conduct because "Range's request —to possess a

rifle to hunt and a shotgun to defend himself at home—tracks the constitutional

right as defined by *Heller*."  *Id.* (quoting *Heller*, 554 U.S. at 582 ("[T]he Second

Amendment extends, prima facie, to all instruments that constitute bearable arms,

even those that were not in existence at the time of the founding.")  In *Bruen*, the

Supreme Court held that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. Applying this standard to the facts in *Bruen*, the Court found the test easily satisfied because the plain text of the Second Amendment protects the plaintiffs' proposed course of conduct of carrying handguns in public. *Id.* at 2134–35.

In *Bruen* and *Range*, the plaintiffs' proposed conduct was readily apparent because they filed lawsuits to allow them to engage in the conduct at issue. In a criminal case, a different approach is required. Quailes asserts that the allegations in the indictment should be assumed for purposes of answering this question. (Doc. 86, p. 6.) Here, the indictment alleges that Quailes possessed handguns and ammunition. (*Id.*) Quailes asserts that since possession of a firearm either in one's home or carried in public is clearly Second Amendment conduct, the standard is met. (*Id.*)

The Government argues that Quailes' challenge fails at this step in the analysis because the Supreme Court has made clear that "the core purpose of the Second Amendment is to protect the right to maintain arms to use in self-defense," "the government may disarm a person who possesses a firearm for an illegal purpose," and "Quailes has not argued that he possessed the gun for purposes of self-defense." (Doc. 92, pp. 12–14.) In reply, Quailes asserts that the

Government's argument that he must affirmatively establish that he possessed the firearm for self-defense "reads a requirement into the *Bruen/Range* analysis that does not exist." (Doc. 94, p. 2.)

In a criminal case, a defendant accused of illegal possession of a firearm pursuant to Section 922(g) cannot be required to state his purpose for possessing a firearm without simultaneously admitting the possession, which is an element of the offense. The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon. Accordingly, there cannot be a requirement for the defendant to state his purpose for possessing the firearm. Rather, as suggested by Quailes, the court will accept the conduct alleged in the indictment as true for purposes of making this determination. Quailes' possession of a firearm is conduct covered by the plain text of the Second Amendment: "[T]he right of the people to keep and bear Arms, shall not be infringed." *See Bullock*, 2023 WL 4232309 at *28 (holding that the plain text of the Second Amendment covers Mr. Bullock's conduct, which was "possession of ordinary firearms in the home").

The Government makes a second argument about why the Second Amendment did not apply to Quailes at the time of the offense—that is, because he was on state parole at the time, and his possession of loaded firearms violated the terms of his parole. (Doc. 92, pp. 14–15.) Quailes replies that his status as a state

21

parolee is irrelevant and unconnected to the analysis under *Bruen/Range*.  (Doc. 94, p. 2.)

Although the Government's point is a bit opaque, the court construes this as a similar argument to the first: because Quailes did not lawfully possess the firearms, his conduct in possessing them is not entitled to Second Amendment protection.  This argument puts the cart before the horse.  That Quailes may lawfully be stripped of a firearm does not prove that he did not have a Second Amendment right to possess the firearm to begin with.  *See Range*, 69 F.4th at 102 (citing *Binderup*, 836 F.3d at 344; *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)).  In other words, the fact that Quailes may have violated the conditions of his state parole by possessing the firearm—as well as allegedly violating federal law by possessing the firearm due to his status as a convicted felon—does not answer the question of whether his conduct of possessing the firearm is covered by the Second Amendment.  For the reasons already explained, Quailes' possession of a firearm is conduct covered by the plain text of the Second Amendment.  As a result, "the Constitution presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2126.

### iii. The Government has not met its burden of establishing that Section 922(g)(1) is consistent with the Nation's "historical tradition of firearm regulation" as applied in this case.

Having determined that Quailes and his conduct are protected by the Second Amendment, the court must determine whether the Government can

constitutionally "strip him of his right to keep and bear arms." *Range*, 69 F.4th at 103. In order to make this determination, the court must decide whether the Government can justify the criminalization of firearm possession by Quailes "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *see also Range*, 69 F.4th at 103.

In *Bruen*, the Supreme Court provided some guidance as to the method courts should employ to make this determination. The court should first assess whether the challenged firearm regulation addresses a "general societal problem that has persisted since the 18th century" or a problem that was "unimaginable at the founding." *Bruen*, 142 S. Ct. at 2131–32; *see also Range*, 69 F.4th at 103. Although the Government does not expressly state that it views Section 922(g)(1) as a regulation intended to address a societal problem that was "unimaginable at the founding," it implicitly takes this position by arguing on the basis of historical analogs that are, in the Government's view, relevantly similar. (Doc. 92, pp. 16–22.) This is the methodology that is applicable to a challenged regulation addressing a modern problem. *Bruen*, 142 S. Ct. at 2132.

In order to analyze Section 922(g)(1) under this framework, the court must determine whether a historical regulation is a proper analogue for Section 922(g)(1), which requires a determination of whether the two regulations are "relevantly similar." *Bruen*, 142 S. Ct. at 2132. In order to ascertain whether

regulations are "relevantly similar," the Court notes that "*Heller* and *McDonald*

point toward at least two metrics:  how and why the regulations burden a law-

abiding citizen's right to armed self-defense."  *Id.* at 2133.  The Court explains that

the burden on the Government is to identify a "well-established and representative

historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not

a dead ringer for historical precursors, it still may be analogous enough to pass

constitutional muster."  *Id.*

Under this framework, the court must first specify what exactly the

Government must establish by analogical reasoning.  Is it the Government's

burden to establish a historical analogue for Section 922(g)(1)'s criminalization of

firearm possession by a person convicted of any felony or felony-equivalent

offense?  Or, given that this is an as-applied challenge, and Quailes' predicate

convictions are for drug trafficking offenses, must the Government establish a

historical analogue for criminalization of firearm possession by a person convicted

of a felony drug trafficking offense?  Quailes takes the position that the first

framing is correct, stating: "[T]he government must identify founding-era laws that

made it a crime for anyone convicted of an offense punishable by more than one of

year of imprisonment to possess a firearm."  (Doc. 86, p. 6.)  The Government

takes the position that the second framing of the issue is correct, asserting: "There

is clear historical support for restricting the possession of firearms by persons who,

like Quailes, previously committed dangerous drug trafficking felonies." (Doc. 92, p. 16.)

In *Range*, the court stated several times that it was determining whether the historical firearms regulations cited by the Government were analogous to "Range's situation" or "someone like Range." *Range*, 69 F.4th at 104 n.9, 105. Although the court does not explain precisely what aspect of Range's "situation" is most relevant or what metric should be used to determine whether someone is "like Range," the court specifically observes that one founding era law was not a relevant historical analogue because Range's prior offense of making a false statement on a food stamp application did not involve the same conduct as the purported historical analogue. *Id.* at 105. In addition, the conclusion of the majority opinion states: "Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a). . . . Because the Government has not show that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106. Based on a careful review of the history and tradition analysis in *Range*, the court concludes that the more specific formulation of the question presented is the correct one.

So, then, the court will examine the historical analogues identified by the Government in this case to determine whether the Government has met its burden to establish a historical analogue for criminalization of firearm possession by a person who, like Quailes, has been convicted of a felony drug trafficking offense.

First, the Government points to the language in *Heller*, which was repeated in Justice Alito and Justice Kavanaugh's concurring opinions in *Bruen*, that the decisions do not cast doubt on "longstanding prohibitions on the possession of firearms by felons."  (Doc. 92, pp. 16–17 (citations omitted).)  The very same argument was rejected in *Range* because the 1961 version of Section 922(g)(1) does not qualify as a "longstanding" regulation "for purposes of demarcating the scope of a constitutional right."  *Range*, 69 F.4th at 104.[7]  Based on the holding in *Range* that "the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden," the court reaches the same conclusion here.  *Id.*

In *United States v. Bullock*, the district court declined to rely on the language from *Heller*, *McDonald*, and *Bruen* about "longstanding prohibitions on the possession of firearms by felons" because it was dicta that amounted to an advisory

---

[7] The court noted that the earliest version of the statute, the Federal Firearms Act of 1938, applied only to violent criminals, which means that the earlier version of the law would not have applied to Range.  *Range*, 69 F.4th at 104.  The Government has not argued in this case that the 1938 version of the law would have applied to Quailes.  But, even if that argument were raised, the court in *Range* expressed skepticism about whether the 1938 version of the statute would be considered "longstanding" "given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources.  *Id.*

opinion.  2023 WL 4232309 at *17–19 (citations omitted).  Similarly, in *Range*,

the court rejected the argument that the Supreme Court's references to "law-

abiding citizens" in *Heller* was controlling with respect to the issue of whether

Range is among "the people" despite his prior conviction because the references to

"law-abiding responsible citizens" were dicta which should not be "overread" for

multiple reasons.  *Range*, 69 F.4th at 101–03.  The court also noted that the *Heller*,

*McDonald*, and *Bruen* Courts did not actually cite any "longstanding prohibitions"

because they did not undertake an exhaustive historical analysis of the scope of the

Second Amendment.  *Id.* at 103 n.7.  Thus, the "longstanding prohibition"

language in *Heller*, *McDonald*, and *Bruen* does not satisfy the Government's

burden for the additional reason that it is dicta that this court will not construe to

resolve the constitutional issue in this case.

Following the argument that the Supreme Court's "longstanding prohibition

language" is controlling, the Government makes no effort to identify a historical

analogue that involves the criminalization of firearm possession for those

convicted of drug trafficking offenses (or any kind of drug-related or trafficking-

related offense for that matter).  Instead, the Government argues that historical

analogs, including 17th century English law, colonial laws, post-ratification state

laws, and Reconstruction-era state laws, empowered government officials to

disarm those who were deemed dangerous, irresponsible, or unlikely to abide by

the law.[8]  (Doc. 92, pp. 18–22.)  The Government contends that these historical

analogs are relevantly similar to the criminalization of Quailes' possession of a

firearm because his prior drug trafficking convictions demonstrate that he poses a

danger to society.  (*Id.* at 24–26.)  The Government distinguishes the Third

Circuit's analysis of the suggested analogs in *Range* on the ground that Range's

prior conviction did not pose a danger to society.  (*Id.* at 23.)

In the absence of any close historical analogue, the court is tasked with

determining whether a historical regulation is "relevantly similar" to the modern

regulation.  Here, the Government is asserting that historical disarmament of those

deemed dangerous is sufficiently similar to disarming a convicted drug trafficker

such as Quailes to satisfy its burden.  In *Range*, the court considered the argument

presented by Bryan Range that "dangerousness" should be the touchstone for the

"historical tradition" analysis.  *Range*, 69 F.4th at 104 n.9 (noting that the

argument rested upon a concurring opinion in *Binderup*, 836 F.3d at 369, Judge

Bibas' dissent in *Folajtar*, 980 F.3d at 913–20, and then Judge-Barrett's dissent in

---

[8] The Government also points to precursors to the Second Amendment proposed in the state ratifying conventions in Pennsylvania and Massachusetts. (Doc. 92, pp. 19–20.)  In each proposal, it was suggested that those who presented a "danger of public injury" or were not "peaceable citizens" would not have a right to keep and bear arms.  (*Id.*)  The Government does not meet its burden with this historical evidence because the proposed precursors to the Second Amendment did not become law and the import of that fact is difficult to discern.  In addition, it is not clear that proposals made during two ratifying conventions is sufficient evidence to establish a historical tradition.  *See Bullock*, 2023 WL 4232309 at *22–23; *see also Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

*Kanter*, 919 F.3d at 454).  The court noted that the Government replied to the

argument by asserting that "10 of the 15 judges in *Binderup* and the Court in

*Holloway* and *Folajtar* rejected dangerousness or violence as the touchstone."[9]  *Id.*

The court then stated that it would not resolve that dispute because "the

Government did not carry its burden to provide a historical analogue to

permanently disarm someone like Range, whether grounded in dangerousness or

not."  *Id.*

In order to determine whether the historical disarmament of those deemed

dangerous is "relevantly similar" to disarming a convicted drug trafficker such as

Quailes, the court is instructed to look at the two metrics of "how and why the

regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*,

142 S. Ct. at 2133.  The Government has not presented any argument comparing

the "how and why" of the historical "dangerousness" regulations with the "how

and why" of Section 922(g)(1).  Instead, the Government has merely catalogued

historical regulations that disarmed individuals who posed a risk of dangerousness

to varying extents.  In one of the earlier regulations, entire groups were disarmed,

whereas another law called for case-by-case judgments.  (Doc. 92, pp. 18–19.)

The Government cited another historical law that disarmed individuals who

---

[9] It is interesting to note that the Government argued in *Range* that dangerousness is not the
touchstone for the historical analysis, whereas it asserts the opposite here.

demonstrated their dangerousness by engaging in particular types of conduct, such as carrying arms in a manner that spreads fear or terror among the people.  (*Id.*) The Government pointed to the fact that, in the mid-19[th] century, many states enacted laws requiring "those threatening to do harm" to post a bond before they would be permitted to carry weapons in public.  (*Id.* at 20.)  Then, the Government pointed to a Reconstruction-era regulation in South Carolina that disarmed "disorderly person[s], vagrant[s], [and] disturber[s] of the peace.  (*Id.* at 21.)

Even assuming that the examples of the historical regulations are sufficiently relevant and numerous to establish a historical *tradition* of disarming the dangerous, the Government did not explain to any extent the "how" of each regulation—such as the length of time the individuals were disarmed; whether a conviction was required or any other information about how the dangerousness determination was made; or what kind of offenses qualified as dangerous.  The Government also did not present any argument as to the "why" or purpose of the historical regulations.  Because the Government has not provided the court with a basis to determine whether the mechanics and purpose of the historical regulations disarming those deemed "dangerous" are similar to the mechanics and purpose of Section 922(g)(1), the Government has not carried its burden to establish that the historical regulations are "relevantly similar."

Although the Government did not explain the "how" or "why" of the cited historical regulations or compare the mechanics or purpose of those regulations to Section 922(g)(1), the Government does argue generally that Quailes' prior drug trafficking convictions demonstrate that he poses a danger to society.  (Doc. 92, pp. 24–25.)   The Government cites multiple authorities for the proposition that firearms are frequently used in connection with drug trafficking, which poses a danger to society.  (*Id.*)  The Government then concludes—without the kind of explanation required by *Bruen*—that "[b]arring the possession of firearms by persons who have been convicted of a drug-trafficking offense is 'part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  (*Id.* at 25–26 (quoting *Bruen*, 142 S. Ct. at 2127).)  The Government's conclusion rests on dangerousness as the historical "touchstone" without any explanation of how the earlier regulations compare in mechanics or purpose to Section 922(g)(1).  This comparison is too broad and does not carry the Government's burden under the *Bruen/Range* standard.  *See Bruen*, 142 S. Ct. at 2138 (finding that the historical record compiled by respondents did not demonstrate a tradition of prohibiting the public carrying of commonly used firearms for self-defense); *Range*, 69 F.4th at 105 (finding that the Government did not successfully analogize historical status-based restrictions to disarm certain

groups of people to Range and his individual circumstances and any such analogy would be far too broad).

Finally, if "dangerousness" is found to be the touchstone of the historical analogue analysis, then the court has concerns in the application of that standard in this case as well as future cases.  With respect to Quailes, his prior drug trafficking offenses did not include firearms or crimes of violence.  (*See* Doc. 92-1.)  Thus, even if the Government's argument that our Nation has a historical tradition of disarming those who pose a danger to society is accepted (which this court has not), then the court must also consider whether the disarming of a non-violent drug offender for life is consistent with this tradition.  Perhaps that is not such a stretch given the dangers posed to society from drug trafficking as noted by the Government.

But then, what about those who launder money in order to conceal the proceeds of drug trafficking, or those who maintain a premises for the purpose of drug trafficking but are not otherwise involved in the drug trafficking activities directly?  Assuming it is ultimately concluded that drug trafficking is a "dangerous" crime for purposes of this Second Amendment analysis, are these activities sufficiently connected to drug trafficking as to be consistent with a tradition of disarming those who pose a danger to society?

Of course, these offenses are not at issue in this case, but the court poses these questions because the potential application of a "dangerousness" standard will necessarily lead to this kind of case-by-case analysis that will involve consideration of the elements of the predicate offenses and possibly even the facts underlying those offenses in a manner that would resemble the categorical and modified categorical approach to determine whether a defendant's prior conviction is a "violent felony" for purposes of the Armed Career Criminal Act. *See Bullock*, 2023 WL 4232309 at *27 (noting a similar concern and compiling criticism of these analytical approaches).  Moreover, in order for "dangerousness" to be the standard for judging modern firearm regulations, then a clear definition will need to be determined in order to avoid endless challenges and uncertainty in applying a standard which has obvious interpretive complexity.  These considerations, though not the basis for granting Quailes' motion to dismiss, warrant further consideration as courts continue to assess the constitutionality of Section 922(g)(1).

## CONCLUSION

For the foregoing reasons, Quailes' motions for reconsideration and to dismiss the indictment will be granted. An implementing order will follow.

> s/Jennifer P. Wilson
> JENNIFER P. WILSON
> United States District Judge
> Middle District of Pennsylvania

Dated: August 22, 2023